*Court of Appeals*
*Fourth Court of Appeals District of Texas*
*San Antonio*





## OPINION

No. 04-09-00695-CV

Dell R. **CULLUM**,
Appellant

v.

Dalene M. **WHITE** and Diamond A. Ranch,
Appellees

From the 38th Judicial District Court, Real County, Texas
Trial Court No. 2007-2704-DC
Honorable Camile G. Dubose, Judge Presiding

Opinion by:  Sandee Bryan Marion, Justice

Sitting:  Karen Angelini, Justice
Sandee Bryan Marion, Justice
Steven C. Hilbig, Justice

Delivered and Filed:  December 14, 2011

AFFIRMED IN PART AND REVERSED AND RENDERED IN PART

Dell Cullum appeals the judgment awarding Dalene White actual and punitive damages

on her libel claim and the permanent injunction entered as a pretrial sanction.

### BACKGROUND

White is the owner of Diamond A Ranch in Leakey, Texas, which among other

enterprises, operates an exotic game ranch.  White and her family are well known in the

community as long-time residents and ranchers.  White hired her son Damon to run the hunting

operation on the Ranch, and witnesses testified he was a proficient ranch manager. Residents of the community and family friends testified that White has a reputation of honesty, and she ran the Ranch in a professional manner. White testified she sees herself as Diamond A Ranch and considers comments about the Ranch to be about her.

Cullum worked for White from 2005 to 2006 as a ranch hand. He is also a photographer who took photographs of the Ranch. Cullum testified White treated him as family, was always nice to him, and he thought of her as a second mother. Damon testified that when the Ranch's website went up in June 2006 it included photographs taken by Cullum and that Cullum did not object. Cullum left the ranch in August 2006. Damon testified he took Cullum's photographs off the website that same month. However, Cullum testified that after leaving his employment at the Ranch his photographs were being used on the Ranch's website without his permission so he filed a copyright lawsuit in federal court.

The evidence demonstrates that Cullum sent emails to Roger Raglin and Donald Thacker, both of whom had hunted at the Ranch. Raglin is the owner of a company that films hunting and fishing shows. The email to Raglin included information regarding Damon and made comments on how the Ranch was operated. Cullum stated he left the Ranch due to Damon's "behavior," referred to a "severe drinking issue," and called him a "pathological liar." He stated he was suing the Ranch for copyright infringement and insinuated White and Damon would be federally charged. He also stated he had tape recordings of Damon admitting to shooting and killing a Mexican transient on the Ranch and that Damon was being "flagged" by the FBI for possible "terrorist activity." Cullum wrote he offered the tapes to Damon's "mother but she refused to acknowledge them."

The email also included information regarding one of Raglin's hunting trips at the Ranch. Cullum stated that the blackbuck deer Raglin shot was domesticated and Cullum had been instructed not to inform Raglin of that fact. Cullum explained he was instructed "to rile [the blackbuck] up" before Raglin arrived so "it wouldn't just walk up to you the first night," which Cullum said he did by chasing it with his four wheeler. Cullum also made claims regarding how the hog hunts were conducted in the same manner. After setting out these facts Cullum wrote "[t]his is the kind of behavior and ethic they run their business on . . . ."

Cullum also sent an email to Donald Thacker. Thacker owned a production company called Big Timber Trails Outdoor Production. Thacker testified he paid for his first hunting trip at the Ranch and thereafter he traded hunting on White's property for advertisement on his national television show. In the email, Cullum accused Thacker of infringing on his copyright by posting the Ranch link and logo on his webpage. Cullum also made comments in the email about tapes he sent to the FBI and wrote that after the copyright case was finalized "we will be filing Federal Charges." Thacker testified that after receiving the email, he informed the Whites he would not be able to advertise or promote the Ranch on his show or on his website. Cullum also sent an email to Feather Flage, a company that sells hunting clothing, after seeing its link on the Ranch's website. The email made similar representations as in the emails to Raglin and Thacker.

Cullum posted a website called "diamondalcoholicranch.com" that White believes referred to her and the Ranch. The webpage appeared as follows:

COMING SOON

The Whole Story – The Real Story
The Pictures – The Video – The Audio Tapes
The Letters – The Photo Shoot – The Witness's
The Scams – The Lies – The Secrets

The Claims – The Crimes
THE PROOF

Pornography – Alcohol Sickness – Drugs – Murder – Militia – Terrorism
Child Endangerment – Animal Abuse – Sabotage – CIA – FBI
Corruption
Dysfunctional Family – Mental Illness – Sex – Adultery – Felony
Thievery – Pathological Liar – Family Secrets
Bad Business – Dishonesty – Illegal Alien – Tax Evasion – Failure
Arrogance – Racism – Cheating Girlfriend – Porn Star – Exhibitionism
Military School Secrets – The Excuses – The Spics – The Insider
The Set Up's – The Stupidity – The Slander
The English Connection – The Cosmetic Connection
The Cowboy in a Woman's Body – The Piranha Girl – The Crazy Mexican
And the Evil that Rules it All!!

A fictional tale of the most bizarre Ranch in America
You'll never look at Hunting the same.

There was evidence that individuals associated with the Ranch saw Cullum's website. A friend of White testified that when he viewed the Ranch's official website he observed a posting on the guestbook that had a link to "diamondalcoholicranch.com." The posting identified the author as a former ranch hand and included derogatory comments about how the Ranch was run. A friend of White testified he saw the link on the guestbook posting and clicked through to the "diamondalcoholicranch.com" webpage.

The Ranch as a limited partnership and White individually sued Cullum for libel. White also sued for intentional infliction of emotional distress. White sought a temporary and permanent injunction to enjoin Cullum from ever speaking or posting anything on the internet about White or the Ranch. The trial court granted the temporary injunction and ordered the website taken down. Cullum complied. Before trial White moved for a permanent injunction as a death penalty sanction against Cullum for alleged misconduct on the part of Cullum and his counsel. The trial court conducted a pretrial hearing and entered a permanent injunction as a sanction that provided in part:

IT IS, THEREFORE, ORDERED, ADJUDGED, AND DECREED that Defendant, DELL R. CULLUM be, and hereby is, commanded to desist and refrain from:

1. contacting any existing or former clients of Plaintiffs for any purpose;

2. posting any information, on any internet medium, about Plaintiff White, the Diamond A Ranch, or any operations, affiliations, or employees associated therewith;

3. communicating with third parties, either orally or in writing via the internet or any recognized postal delivery method any information regarding Plaintiff White, the Diamond A Ranch, or any operations, affiliations, or employees associated therewith;

4. creating or assisting in the creation of any website which mentions Leakey, Real County, Plaintiff White, Diamond A Ranch, or any operations, affiliations, or employees associated therewith;

5. publishing, by any means, any material that in any way refers to Plaintiff White, the Diamond A Ranch (or any operations, affiliation, or employees associated therewith);

6. publishing, by any means, any information or material that has been recorded electronically, digitally, or by video, and whether or not created by Defendant, his agents, or anyone acting on his behalf, that in anyway refers to Plaintiff White, the Diamond A Ranch (or any operations, affiliation, or employees associated therewith); and

7. posting the website "diamondalcoholicranch.com" on the internet.

The case proceeded to trial, however, during trial the Ranch's claims were dropped and only White's individual claims were submitted to the jury. Eleven of the twelve jurors found that each of the three emails and the content of the website referred to White and were defamatory. A unanimous jury awarded White $50,000.00 for mental anguish and $50,000.00 for damage to her reputation.[1] The jury unanimously found that the harm to White was the result of malice and awarded $100,000.00 in exemplary damages. Cullum appeals.

---

[1] The jury was instructed to not answer the intentional infliction of emotional distress question if it found the statements were libelous.

**DISCUSSION**

*Denial of motion to strike third amended petition*

In his first issue, Cullum asserts the trial court abused its discretion in allowing White to file a third amended petition five days before trial. Cullum contends the third amended petition "changed the whole nature" of White's suit and "operated as a surprise." Cullum also contends the third amended petition alleged for the first time business disparagement and slander claims, which he argues led to the admission of evidence that prejudiced the jury.

We review a trial court's ruling on whether to allow an amended pleading under an abuse of discretion standard. *Hardin v. Hardin*, 597 S.W.2d 347, 349-50 (Tex. 1980). Pleadings may be amended within seven days of trial "only after leave of the judge is obtained, which leave shall be granted by the judge unless there is a showing that such filing will operate as a surprise to the opposite party." TEX. R. CIV. P. 63. "A trial court has no discretion to refuse an amended pleading unless (1) the opposing party presents evidence of surprise or prejudice; or (2) the amendment asserts a new cause of action or defense, and thus is prejudicial on its face, and the opposing party objects to the amendment." *Halmos v. Bombardier Aerospace Corp.*, 314 S.W.3d 606, 622 (Tex. App.—Dallas 2010, no pet.); *see also Hakemy Bros., Ltd. v. State Bank & Trust Co.*, 189 S.W.3d 920, 924 (Tex. App.—Dallas 2006, pet. denied) (citing *State Bar of Tex. v. Kilpatrick*, 874 S.W.2d 656, 658 (Tex. 1994).

To show an amended pleading with new causes of action is prejudicial on its face, Cullum must demonstrate the new claims reshaped the nature of the trial, that he could not have anticipated the new matter "in light of the development of the case up to the time of the amendment," and the amendment detrimentally affected the presentation of his case. *See Halmos*, 314 S.W.3d at 623. Cullum did not demonstrate any of the three criteria. Rather, he

merely argues the amended petition allowed the admission of evidence related to damages for intentional infliction of emotional distress, which he claims should not have been admitted.

Furthermore, neither of the two new claims were submitted to the jury. Only libel and intentional infliction of emotional distress were submitted, both of which were in the second amended petition. Cullum also argues that the third amended petition included new factual allegations regarding statements he made to Thacker. However, he did not present any argument on how he was surprised or prejudiced by the additional allegations. Cullum has not demonstrated the trial court abused its discretion in denying his motion to strike White's third amended petition.

### *Admission of Donald Thacker's deposition testimony*

In issues two and three, Cullum contends the trial court erred in admitting Donald Thacker's deposition testimony. To reverse a judgment based on an error in admitting evidence, the complaining party is required to demonstrate the trial court erred in admitting the evidence and that the judgment turns on the particular evidence admitted. *Nissan Motor Co. Ltd. v. Armstrong*, 145 S.W.3d 131, 144 (Tex. 2004). First, we need not determine whether the trial court erred in admitting Thacker's testimony because Cullum has not demonstrated the jury's verdict turned on Thacker's testimony. Second, although Cullum complains Thacker's testimony was inadmissible as an expert on pecuniary loss, White did not submit a jury question for pecuniary loss. Cullum did not present any argument in his brief on how Thacker's testimony impacted the jury's verdict. We reverse only if "the error probably (though not necessarily) resulted in an improper judgment." *Id*. After reviewing the evidence, we conclude Cullum has not demonstrated harmful error.

***Libel***

Cullum contends White did not present legally sufficient evidence to support the jury's finding of libel. Cullum contends the e-mails and website do not point directly or indirectly to White, are not actionable in defamation, and that there is no evidence to support actual damages. In order to establish a defamation claim, the plaintiff must prove that (1) the defendant published a factual statement, (2) that was capable of defamatory meaning, (3) concerning the plaintiff, (4) and acting with negligence, if the plaintiff is a private individual, concerning the truth of the statement. *WFAA-TV, Inc. v. McLemore*, 978 S.W.2d 568, 571 (Tex. 1998).

Under the Texas legal sufficiency standard of review, we view the evidence in a light most favorable to the finding and indulge every reasonable inference to support it. *City of Keller v. Wilson*, 168 S.W.3d 802, 822 (Tex. 2005). We credit favorable evidence if a reasonable fact-finder could, and disregard contrary evidence unless a reasonable fact-finder could not. *Id.* at 827. If there is more than a scintilla of evidence to support the finding, the legal sufficiency challenge fails. *Formosa Plastics Corp. USA v. Presidio Eng'rs & Contractors, Inc.*, 960 S.W.2d 41, 48 (Tex. 1998). More than a scintilla of evidence exists "if the evidence 'rises to a level that would enable reasonable and fair-minded people to differ in their conclusions.'" *Ford Motor Co. v. Ridgway*, 135 S.W.3d 598, 601 (Tex. 2004) (quoting *Merrill Dow Pharm., Inc. v. Havner*, 953 S.W.2d 706 (Tex. 1997)).

**A. Capable of a defamatory meaning about White**

The Texas Supreme Court adopted the test used by the U.S. Supreme Court in *Milkovich v. Lorain Journal Co.*, 497 U.S. 1 (1990) for determining whether a statement is actionable in defamation. For a statement to be actionable in defamation, it must expressly or impliedly assert facts that are objectively verifiable. *Bentley v. Bunton*, 94 S.W.3d 561, 580-81 (Tex. 2002);

*Milkovich*, 497 U.S. at 19-21; *Bentley*, 94 S.W.3d at 580-81. Whether a factual statement is capable of a defamatory meaning depends on a reasonable person's understanding of the whole publication and not merely on individual statements. *Bentley*, 94 S.W.3d at 580-81. The publication must assert facts that are objectively verifiable. *Id.* A person is referred to in a defamatory statement if the person is named in the statement or if those who know the person would understand that the statement was referring to the person. *Newspapers, Inc. v. Matthews*, 339 S.W.2d 890, 893-94 (Tex. 1960); *Ledig v. Duke Energy Corp.*, 193 S.W.3d 167, 180 (Tex. App.—Houston [1st Dist.] 2006, no pet.); *Am. Broad. Cos. Inc. v. Gill*, 6 S.W.3d 19, 34 (Tex. App.—San Antonio 1999, pet. denied).

Each of the emails referred to White as Damon's mother or to the Ranch owner or operator. The evidence established that White owns the Ranch and that she is Damon's mother. The email to Raglin included statements concerning operation of the Ranch, unethical business practices, and also stated "a website is also ready to be posted uncovering some very disturbing information about the Ranch and the operators." White testified none of the assertions in the email regarding Damon or Ranch operations were true. She and other witnesses confirmed that no one ever used a four wheeler to chase the animals around the Ranch and safety was a top concern at the Ranch. The email to Feather Flage was similar to the Raglin email, it referred to Damon's mother (White), accused her of ignoring illegal activity, and inferred unethical business practices. Feather Flage had arranged with the Ranch to provide free clothing and post a link on its website to the Ranch. Damon testified after the email was sent the company declined to proceed with the arrangement. We conclude there is more than a scintilla of evidence upon which the jury could infer that the statements referred to White even though she was not identified by name. *Matthews*, 339 S.W.2d at 893; *Ledig*, 193 S.W.3d at 180; *Gill*, 6 S.W.3d at

34. Anyone familiar with the Ranch would understand the emails as referring to White and the Ranch.

As to the website, it included information that anyone acquainted with White would understand it referred to the Ranch and infer it related to White. The evidence demonstrated White had a long reputation as a Mary Kay representative and the webpage referred to a cosmetic connection. The webpage referred to a hunting ranch, to the FBI, animal abuse, murder, pathological liars, and alcohol sickness, all of which is similar to the information included in the emails. At trial, Cullum attempted to explain his comments as merely referring to a fictional book he was writing, but he admitted some of the ideas came from his time working at the Ranch. The jury could infer from Cullum's reference to the website in the Raglin email that it referred to White and the Ranch.

Finally, the emails and the webpage clearly include actionable defamation. From the summary set out above, a reasonable person could understand the publications as a whole as defamatory. *See Bentley*, 94 S.W.3d at 579. The publications contained facts that accused White of illegal activity and impeached her honesty, integrity and ethics personally and in her business as a ranch operator. There is more than a scintilla of evidence to support the finding of libel.

**B. Libel Damages**

Cullum asserts that White is not entitled to recover damages for mental anguish and injury to reputation because she did not prove "special" damages. Defamation claims are divided into two categories, defamation per se and defamation per quod, and the level of proof is different for each type of claim. *Tex. Disposal Sys. Landfill, Inc. v. Waste Mgmt. Holdings, Inc.*, 219 S.W.3d 563, 580-81 (Tex. App.—Austin 2007, pet. denied); *Moore v. Waldrop*, 166 S.W.3d 380, 384 (Tex. App.—Waco 2005, no pet.). A plaintiff can recover for statements that are

defamatory per quod if the plaintiff proves both the defamatory nature of the statement and the amount of damages caused by the publication of that statement. *Exxon Mobil Corp. v. Hines*, 252 S.W.3d 496, 500 (Tex. App.—Houston [14th Dist.] 2008, pet. denied); *Tex. Disposal*, 219 S.W.3d at 580. By contrast, in cases involving defamation per se, "our law presumes that statements that are defamatory per se injure the victim's reputation and entitle him to recover general damages, including damages for loss of reputation and mental anguish." *Bentley*, 94 S.W.3d at 604. Publications are "libel per se if they include statements that (1) unambiguously charge a crime, dishonesty, fraud, rascality, or general depravity, or (2) are falsehoods that injure one in his office, business, profession, or occupation." *Main v. Royall*, 348 S.W.3d 381, 390 (Tex. App.—Dallas 2011, no pet.); *see also Moore*, 166 S.W.3d at 384; *Knox v. Taylor*, 992 S.W.2d 40, 50 (Tex. App.—Houston [14th Dist.] 1999, no pet.). The emails and the webpage clearly fit into the per se category.

Citing *Exxon Mobil Corp. v. Hines*, Cullum argues the trial court charged the jury with defamation per quod because the charge made no mention of damages being presumed. In *Hines*, the court held that the trial court charged the jury only on defamation per quod because the defamation-damage question did not include an instruction that the damages were presumed. *Exxon Mobil Corp.*, 252 S.W.3d at 501. Unlike the case before us, however, the plaintiffs in *Hines* never argued in the trial court or on appeal that their claims were defamation per se as opposed to per quod. *See id.* White pled defamation per se and requested the following instruction: "You must award at least nominal damages for injury to reputation in the past." The comments to Texas Pattern Jury Charge: Defamation PJC 115.33, (Texas State Bar 2010 ed.) state this instruction should be included where the statements are defamatory per se. Nominal damages are recoverable for libel per se. *See Leyendecker & Assocs., Inc. v. Wechter*, 683

S.W.2d 369, 374 (Tex.1984) ("The law presumes a statement which is libelous per se defames a person and injures his reputation."); *see also Downing v. Burns*, 348 S.W.3d 415, 425 (Tex. App.—Houston [14th Dist.] 2011, no pet.). Clearly, the trial court charged the jury on defamation per se.

### C. Amount of damages

Cullum also claims there is legally insufficient evidence to support the $50,000 award for injury to reputation in the past and the $50,000 award for mental anguish in the past. In defamation per se cases, general damages are presumed to flow from the nature of the defamation itself; thus, such an action can be sustained even without specific proof of the existence and amount of harm. *Exxon Mobil Corp.*, 252 S.W.3d at 501. However, even in defamation per se cases, appellate review of amounts awarded for non-economic damages is still required "to ensure that any recovery only compensates the plaintiff for actual injuries and is not a disguised disapproval of the defendant." *Bentley*, 94 S.W.3d at 605. In *Bentley*, the Texas Supreme Court considered, among other issues, whether the evidence supported any award of actual damages to the plaintiff, and alternatively, whether the amount of actual damages was supported by the evidence.

The Court first noted that Texas law presumes that statements that are defamatory per se injure the victim's reputation and entitle him to recover general damages, including damages for loss of reputation and mental anguish. *Id.* at 604. After reviewing the evidence, the Court concluded "the jury could readily have found that [the plaintiff's] reputation was in fact injured and that he in fact suffered mental anguish on account of the defendants' conduct." *Id.* The issue then became whether the amount of damages awarded was supported by the record.

In *Bentley*, the jury found that the defendants caused the plaintiff $150,000 in actual damages to his character and reputation. On appeal, the Supreme Court acknowledged that "[n]on-economic damages like these cannot be determined by mathematical precision; by their nature, they can be determined only by the exercise of sound judgment." *Id.* at 605. However, the Court also stated that "the necessity that a jury have some latitude in awarding such damages does not, of course, give it carte blanche to do whatever it will, and this is especially true in defamation actions brought by public officials." *Id.*

The Court held that appellate courts are "authorized to determine whether damage awards are supported by insufficient evidence—that is, whether they are excessive or unreasonable." *Id.* In other words, there must be some evidence to justify the amount awarded. *Id.* The Court stated that while the impossibility of any exact evaluation of injury to reputation requires that juries be given a measure of discretion in finding damages, that discretion is limited. *Id.* "Juries cannot simply pick a number and put it in the blank. They must find an amount that, in the standard language of the jury charge, 'would fairly and reasonably compensate' for the loss." *Id.* "There must be evidence that the amount found is fair and reasonable compensation, just as there must be evidence to support any other jury finding." *Id.*

Although the plaintiff in *Bentley* acknowledged he had not incurred any monetary loss as a result of the defendants' conduct, he offered evidence regarding the injury to his reputation and the mental stress he had suffered. He testified the defendants

> have taken time from me. They have ruined moments with my family, with my friends. They have—they have put a cloud over my home, my four children. And Jackie Gates, yes, sir, Mr. Gates—perhaps even more than Mr. Bunton—they have—I have—I have agonized because my name means something to me.... In a lot of ways, it's all I've got, and I've—the day I became judge, I appreciated that I had a position of trust, and that of all people I needed to maintain my integrity and try to be a virtuous man. I've got four children that I don't want [sic]

> embarrassed, and every time Mr. Gates or the rest of them opened their mouth, I know how it hurt them, how it hurt my sister, how it hurt my family.

*Id.* at 576.  The plaintiff testified the accusation against him had been "the worst thing that's happened to me in my life," going "to the very heart of what my whole life is about."  *Id.* Everywhere he went, he said, people would say that they had heard him called corrupt, although "most of them are well-meaning and a lot of them said it was joking."  *Id.*  He said he spent time worrying at home about the accusations, and that he worried about the effect on his family and the treatment of his children by their peers at school.  *Id.*  After reviewing the evidence before it, the Court determined the actual damages found by the jury for injury to the plaintiff's reputation was "well within a range that the evidence supports."  *Id.* at 607.  However, the Court remanded the cause to the Tyler Court of Appeals to reconsider the excessiveness of the jury's award of seven million dollars in mental anguish damages.

As to the award of mental anguish damages, the Tyler Court of Appeals noted the record showed, primarily, that the plaintiff's home life, rather than his professional life, was injuriously affected:

> The evidence shows some mental suffering. Although Bentley [the plaintiff] sulked and worried, was upset because his children were embarrassed, and was even sad and depressed, his mental suffering never rose to a level requiring the attention of a professional to help him cope with it. There is no evidence that Bentley suffered an economic loss tied to his mental anguish. We acknowledge that Bunton's actions created a very unpleasant time for Bentley and his family. However, the jury did not accurately assess Bentley's actual damages in this case. An award of $7,000,000.00 in mental anguish damages is unsupported by the evidence and is so large as to be contrary to reason.

*Bunton*, 176 S.W.3d 18, 20-21 (Tex. App.—Tyler 2003), *aff'd in part, rev'd on other grounds and remanded in part*, 153 S.W.3d 50 (Tex. 2004).  The Tyler court, therefore, sustained the defendant's issue to the extent he complained about the excessiveness of mental anguish

damages and suggested a remittitur in lieu of a new trial, which resulted in a judgment for $150,000 in mental anguish damages. *Id*. at 21.

Here, there was evidence that after receiving Cullum's email, Thacker informed the Whites that while the ranch was one of the best places to film hunts, he would not be able to advertise or promote the ranch on his show or on his website any longer. In a letter Thacker wrote:

> We do not wish to become entangled in legal matters that are between you and a previous employee. Neither do we care to have our TV viewers and website visitors visit your web site and view the comments or otherwise hear about such comments. This situation now becomes not just a negative reflection on the Diamond A Ranch, but also on our TV show and us.

Thacker also stated he was removing "all photos, video and references of and to" the Ranch from the companies' TV shows and to the Ranch's website. He also stated his company would no longer come to the Ranch to film episodes for its TV show, Big Timber Trails Outdoors that airs on the Sportsman Channel. White testified she felt "pretty devastated" when Thacker stopped filming on the Ranch because it cut off a strong business avenue.

Feather Flage had arranged with Diamond A Ranch to provide them with camo clothing to represent their company, and also had a link on the Diamond A Ranch website. Feather Flage abruptly terminated its relationship with Diamond A Ranch. Roger Raglin likewise discontinued its association with White and the Ranch after receiving the emails from Cullum.

White testified that she felt Cullum's emails were an assault on everything she was. White testified she believed the webpage directly referenced her and the Ranch due to the "Cosmetic Connection" reference. White testified she was well established in the cosmetic industry as a Mary Kay consultant beginning in 1963. She was extremely concerned that her peers in the industry she spent forty-six years developing would see the posting. She testified it

"tore" her apart to think anyone in the industry would see the posting. She testified she was concerned about damage to her reputation and to her family. White said her energy level was diminished and found she had trouble focusing after Cullum's publications. White testified Cullum's assault on her reputation "broke [her] heart;" and her sense of trust in people was "almost destroyed." White testified her family reputation and her own reputation are extremely important to her. She stated in part:

> I notice the difference in the energy level but I just - that will be temporary is what I keep telling myself. But I have to work harder to focus because my mind gets so scattered on things. I have to be - I have to work hard not to let my emotions overtake my thought processes at some times. When I'm working on something sometimes I have to yank myself back. The biggest, the hardest thing for me to handle is the collateral damage to other people and the damage to our heritage. I'm struggling. I don't want to lose that ranch.

She testified further that she cut herself off from her friends due to this lawsuit, and the isolation has been lonely.

Damon testified his mother was obsessed with Cullum's accusations and would rehash events. He said White isolated herself and he confirmed that her energy level declined after she learned about the emails and the webpage. Damon said his mother was unable to concentrate and lost interest in the Ranch. White's daughter also confirmed her mother's decreased energy level and loss of concentration.

We conclude the evidence is sufficient to support the damages awarded by the jury for injury to White's reputation and her mental anguish. The awards are within the range the evidence supports and are not excessive or unreasonable. *Bentley*, 94 S.W.3d at 605.

### *Charge Error*

Cullum asserts the trial court erred in refusing to submit to the jury his substantial truth, qualified privilege, and legal justification defenses. To preserve error, the party who relies on a

question or definition must tender it in writing in substantially correct form and obtain a ruling. *See* TEX. R. CIV. P. 278; *Mazon Associates, Inc. v. Heritage Wholesale Nursery, Inc.*, No. 05-09-01218-CV, 2011 WL 1107219, at \*6 (Tex. App.—Dallas Mar. 28, 2011, no pet.) (mem. op.); *see also Chubb Lloyds Ins. Co. of Tex. v. Andrew's Restoration, Inc.*, 323 S.W.3d 564, 584 (Tex. App.—Dallas 2010, pet. granted) (the party who relies on that question must tender that question in writing in substantially correct form and obtain a ruling in order to preserve error.").

The record does not include any written questions or instructions related to substantial truth or privilege. The record from the charge conference reflects that Cullum orally requested the submission of the substantial truth defense, but it is not clear from the record the exact question Cullum was requesting. Additionally, there is no mention of privilege during the charge conference. Therefore, we conclude Cullum failed to preserve error as to these affirmative defenses.

Cullum did tender a written question with definitions on legal justification. A party is entitled to a jury question, instruction, or definition if the pleadings and evidence raise an issue on a claim or defense. TEX. R. CIV. P. 278. We review a trial court's decision to refuse a particular jury question or instruction under an abuse of discretion standard of review. *Shupe v. Lingafelter*, 192 S.W.3d 577, 579 (Tex. 2006); *Steak & Ale of Tex., Inc. v. Borneman*, 62 S.W.3d 898, 904 (Tex. App.—Fort Worth 2001, no pet.). A trial court abuses its discretion by acting arbitrarily, unreasonably, or without consideration of guiding principles. *Borneman*, 62 S.W.3d at 904. For an instruction to be proper, it must accurately state the law. *Tex. Workers' Comp. Ins. Fund v. Mandlbauer*, 34 S.W.3d 909, 912 (Tex. 2000).

Cullum requested the jury charge include a question regarding whether he was "legally justified" in sending the emails to Donald Thacker and Roger Raglin because he was trying to

protect the copyright to his photographs. Justification is a defense to tortious interference with contract and tortious interference with prospective business relations, but not to defamation. *See Prudential Ins. Co. of Am. v. Fin. Review Serv., Inc.*, 29 S.W.3d 74, 80 (Tex. 2000) (explaining that because there is no privilege or justification to defame another, privilege and justification are not available defenses to a claim that the defendant used defamation to tortiously interfere with the plaintiff's contract). Accordingly, the trial court did not abuse its discretion by refusing to submit a legal justification question.

Cullum also contends the trial court erred in submitting a question on White's claim for intentional infliction of emotional distress. The jury was instructed not to answer the intentional infliction of emotional distress if it found in favor of White on her defamation claim. The jury followed the instruction and did not answer the question on intentional infliction of emotional distress. Therefore, we conclude Cullum has not demonstrated harmful error. TEX. R. APP. PROC. 44.1.

### *Exemplary Damages*

Cullum contends White is not entitled to recover exemplary damages because there was not a unanimous verdict on her defamation claim. In response, White contends Cullum waived his complaint because he did not object to the jury charge or object to the verdict before the jury was discharged. However, Cullum is not complaining of charge error; rather, he argues that as a matter of law there can be no recovery of exemplary damages without a unanimous jury verdict on the underlying theory of liability. Cullum is correct. As a matter of law, a party cannot recover exemplary damages without a unanimous verdict on the underlying theory of liability. *See Kia Motors Corp. v. Ruiz*, 348 S.W.3d 465, 492 (Tex. App.—Dallas 2011, no pet.) (holding that "requiring the jury to unanimously 'find liability for' exemplary damages necessarily

- 18 -

includes a finding on the underlying theory of liability."); *DeAtley v. Rodriguez*, 246 S.W.3d 848, 850 (Tex. App.—Dallas 2008, no pet.) (affirming take-nothing judgment on exemplary damages where jury finding on underlying theory of liability not unanimous); *see also* TEX. R. CIV. P. 226a (instruction regarding unanimous verdict approved by order of Texas Supreme Court).

White contends Cullum was required to object to the absence of a unanimous verdict before the jury was discharged. We disagree. Errors in the jury's verdict that must be brought to the trial court's attention before the jury is discharged are those that may be cured by further deliberation, such as incomplete or conflicting answers. *See Fleet v. Fleet*, 711 S.W.2d 1, 3 (Tex. 1986); *Cont'l Cas. Co. v. Street*, 379 S.W.2d 648, 650 (Tex. 1964); *Greater Houston Transp. Co., Inc. v. Zrubeck*, 850 S.W.2d 579, 586 (Tex. App.—Corpus Christi 1993, writ denied). There was no defect in the verdict form requiring correction. The verdict in this case was not incomplete, nor were the jury's answers in conflict. Rather, one juror did not agree that the publications were defamatory regarding White. The presiding juror certified that the verdict was unanimous on certain issues and each of the eleven jurors signed the verdict on the one issue that was not unanimous. There was no defect in the verdict form that could have been corrected by further deliberations and Cullum was not required to object before the jury was dismissed in order to preserve error.

The verdict form establishes only eleven jurors found that the statements in the three emails and on the webpage were defamatory concerning White. Therefore, White did not obtain a unanimous verdict on her underlying claim of defamation. Cullum filed a motion notwithstanding the verdict asserting White was not entitled to exemplary damages because there was not a unanimous verdict on defamation, which was sufficient to preserve this matter of law

issue for appeal. *See DeAtley*, 246 S.W.3d at 840; *United Parcel Serv., Inc. v. Tasdemiroglu*, 25 S.W.3d 914, 916 (Tex. App.—Houston [14th Dist.] 2000, pet. denied). Accordingly, White was not entitled to exemplary damages.

### *Denial of No Evidence Motion for Summary Judgment and Motion for Judgment Not Withstanding the Verdict*

Cullum contends the trial court erred in denying his no-evidence motion for summary judgment on White's defamation claim. The general rule is appellate courts do not have jurisdiction to hear the denial of a motion for summary judgment on appeal. *Hines v. Comm'n for Lawyer Discipline*, 28 S.W.3d 697, 700 (Tex. App.—Corpus Christi 2000, no pet.) (citing *Ackermann v. Vordenbaum*, 403 S.W.2d 362, 365 (Tex. 1966)).[2] The denial of a motion for summary judgment is not reviewable after a trial on the merits. *Gen. Res. Org., Inc. v. Deadman*, 907 S.W.2d 22, 28 (Tex. App.—San Antonio 1995, writ denied) (deciding that no appeal may be taken from denial of summary judgment when final judgment was entered following jury trial). We do not have jurisdiction to review the denial of Cullum's no-evidence motion for summary judgment.

Cullum also complains that he was entitled to a Judgment Not Withstanding the Verdict on White's defamation claim because there is no evidence of special damages. However, as discussed above, White pled and proved a libel per se claim and she was not required to prove special damages. The trial court did not err in denying Cullum a Judgment Not Withstanding the Verdict.

---

[2] The only exceptions to this rule are (1) when both parties move for summary judgment, and the trial court grants one motion but denies the other, resulting in a final judgment, *Comm'rs Court of Titus Co. v. Agan*, 940 S.W.2d 77, 81 (Tex.1997), and (2) certain types of cases listed in chapter 51 of the Texas Civil Practices and Remedies Code, TEX. CIV. PRAC. & REM. CODE ANN. § 51.014(a)(5) & (6) (West 2010). Cullum's case does not fall within these exceptions.

***Permanent Injunction Entered as Pretrial Sanction***

White filed a motion to enter a permanent injunction, asserting Cullum should be sanctioned for using delay tactics and violating the temporary injunction. According to White, these tactics included repeated attempts to remove the case to federal court, violations of the docket control order, late designation of an expert, and filing a no-evidence motion for summary judgment. The trial court issued a permanent injunction as a sanction against Cullum before a trial on the merits of White's claims. White argues that under the proper exercise of the trial court's inherent power the permanent injunction as a death penalty sanction was proper.

In order to assess sanctions under the trial court's inherent powers the court must engage in the following process:

> First, the trial court should rely upon the rules and statutes expressly authorizing sanctions whenever possible, and second, the trial court, applying its inherent power to impose sanctions, must make factual findings, based on evidence, that the conduct complained of significantly interfered with the court's legitimate exercise of its core functions.

*Union Carbide Corp. v. Martin*, 349 S.W.3d 137, 147 (Tex. App.—Dallas, no pet.); *see also In re K.A.R.*, 171 S.W.3d 705, 714 (Tex. App.—Houston [14th Dist.] 2005, no pet.) (for trial court to have exercised its inherent power to sanction, there must have been some evidence that conduct of sanctioned party significantly interfered with trial court's legitimate exercise of one of its core functions); *Greiner v. Jameson*, 865 S.W.2d 493, 499 (Tex. App.—Dallas 1993, writ denied) (for inherent power to apply, there must be evidence and findings that alleged bad faith abuse significantly interfered with trial court's legitimate exercise of one of its core powers).

Here, the record does not contain a finding supported by evidence that Cullum's conduct significantly interfered with the trial court's legitimate exercise of its core functions. Furthermore, a request for a permanent injunction is a request for equitable relief, not a separate

claim in and of itself. *Yalamanchili v. Mousa*, 316 S.W.3d 33, 39 (Tex. App.—Houston [14th Dist.] 2010, pet. denied). "To be entitled to permanent injunctive relief, the plaintiffs must plead and prove a valid cause of action against the defendants." *Operation Rescue–Nat'l v. Planned Parenthood of Houston & Se. Tex., Inc.*, 937 S.W.2d 60, 71 (Tex. App.—Houston [14th Dist.] 1996)), *aff'd as modified on other grounds*, 975 S.W.2d 546 (Tex. 1998). White alleged defamation, business disparagement, tortious interference, and intentional infliction of emotional distress causes of action. She recovered only on her defamation claim. "It is well settled that Texas courts will not grant injunctive relief in defamation or business disparagement actions if the language enjoined evokes no threat of danger to anyone . . . ." *Brammer v. KB Home Lone Star, L.P.*, 114 S.W.3d 101, 107 (Tex. App.—Austin 2003, no pet.) (citing *Hajek v. Bill Mowbray Motors, Inc.*, 647 S.W.2d 253, 255 (Tex. 1983). We conclude the trial court erred by imposing a permanent injunction as a sanction against Cullum pursuant to the trial court's inherent power. *See Martin*, 349 S.W.3d at 138. Accordingly, White is not entitled to a permanent injunction.

### *Monetary sanctions for violating temporary injunction*

Cullum complains the trial court erred in ordering monetary sanctions against him for violating the temporary injunction because the trial court did not include a statement of good cause in the order to support the imposition of sanctions. However, Cullum did not object in the trial court of the omission in the order. Therefore he has waived this complaint. *Alexander v. Alexander*, 956 S.W.2d 712, 714 (Tex. App.—Houston [14th Dist.] 1997, pet. denied) ("Numerous appellate courts have held that a complaining party waives error by failing to object to the form of the sanctions order.") (citing *Land v. AT & S Transp., Inc.*, 947 S.W.2d 665, 667 (Tex. App.—Austin 1997, no writ.)); *Campos v. Ysleta Gen. Hosp., Inc.*, 879 S.W.2d 67, 70

(Tex. App.—El Paso 1994, writ denied); *McCain v. NME Hosp., Inc.*, 856 S.W.2d 751, 755 (Tex. App.—Dallas 1993, no writ); *Bloom v. Graham*, 825 S.W.2d 244, 247 (Tex. App.—Fort Worth 1992, writ denied).

Cullum also contends it was improper to sanction him for violating the temporary injunction because the injunction violated his right to free speech. However, Cullum agreed to the temporary injunction, but did not comply with the agreed order when he posted information on the internet regarding White and the Ranch. White filed a motion for sanctions requesting Cullum remove the information from the website and requested $2,000.00 in attorney's fees related to the motion for sanctions. We do not believe the trial court abused its discretion in ordering Cullum pay $2,000.00 in attorney's fees as a sanctions. *See McWhorter v. Shelter*, 993 S.W.2d 781, 788–89 (Tex. App.—Houston [14th Dist.] 1999, pet. denied) (trial court's imposition of sanctions is reviewed under an abuse of discretion standard.)

The judgment awarding exemplary damages is reversed and rendered that Dalene M. White not recover exemplary damages. The trial court's order granting a permanent injunction is set aside. The judgment in all other respects is affirmed.


Sandee Bryan Marion, Justice