ACCEPTED
01-15-00173-CV
FIRST COURT OF APPEALS
HOUSTON, TEXAS
11/9/2015 9:42:09 PM
CHRISTOPHER PRINE
CLERK

## NO. 01-15-00173-CV

IN THE COURT OF APPEALS
FOR THE FIRST DISTRICT OF TEXAS
HOUSTON, TEXAS

FILED IN
1st COURT OF APPEALS
HOUSTON, TEXAS
11/9/2015 9:42:09 PM
CHRISTOPHER A. PRINE
Clerk

_____

JOAN JOHNSON, KALETA JOHNSON, SETH JOHNSON
AND WIRT BLAFFER,

Plaintiff-Appellants

v.

MICHAEL PHILLIPS, SPINDLE TOP PUBLISHING,
AND PHILLIPS AKERS WOMAC, P.C.,

Defendant-Appellees.

_____

On Appeal from the 333rd Judicial District Court
Harris County, Texas
Trial Court Cause No. 2011-14027

_____

## REPLY BRIEF

_____

Marc S. Tabolsky
State Bar No. 24037576
mtabolsky@yettercoleman.com
YETTER COLEMAN LLP
Two Houston Center
909 Fannin, Suite 3600
Houston, Texas 77010
(713) 632-8000
(713) 632-8002 [facsimile]

Patrick Zummo
State Bar No. 22293450
pzummo@zoomlaw.com
LAW OFFICES OF
    PATRICK ZUMMO
Two Houston Center
909 Fannin, Suite 3500
Houston, Texas 77010
(713) 651-0590
(713) 651-0597 [facsimile]

ATTORNEYS FOR APPELLANTS
**ORAL ARGUMENT REQUESTED**

# TABLE OF CONTENTS

INDEX OF AUTHORITIES............................................................................4

INTRODUCTION ......................................................................................8

I.   *Monster In River Oaks* Was Not A Fair Report....................................9

    A.   It Was Difficult For Appellees To Find Trial References Because The Book Was Not A Report Of The Trial...............................9

    B.   As A Simple Example Of Why Appellees Cannot Be Trusted, Most Of The "Sixteen Trial Exhibits" In The Book's Appendix Were Not Exhibits At The Trial. ...........................................10

    C.   *Monster In River Oaks* Is Not A Newspaper Or Periodical, So The Statutory Fair-Report Privilege Does Not Apply............................12

    D.   Appellees Did Not Address Or Carry Their Burden Of Proving The Affirmative Defense Of The Common Law Fair-Report Privilege. ...................................................................14

        1.   By Excusing Their Work As "Devices And Characterizations," Appellees Acknowledge That They "Embellished" Any Descriptions Of The 2008 Trial. ..................15

        2.   Appellees Are Attempting To Self-Confer The Fair-Report Privilege...........................................................16

        3.   Appellees Do Not Have Immunity As Attorneys To Defame Opposing Parties By Publishing A Book Years After They Stopped Representing Their Child Molesting Client...........................................................24

II.  *Monster In River Oaks* Defames The Family. ..................................25

    A.   Appellees' Own Descriptions Of The Book Show That Its Gist Is Defamatory. ...................................................25

B. Plaintiffs Are Not Restricted To Alleging Only One Defamatory Statement........................................................................................27

C. Appellants Have Fully Addressed The Gist-Specific And Statement-Specific Arguments In Their Opening Brief. .........................28

III. Appellees' First Amendment Arguments Are Unavailing................................31

A. Appellees Have The Burden Of Proving Truth And Absence Of Malice, Which They Will Not Be Able To Do.......................................31

1. Appellees' "Self-Published" Book Precludes Them From Being Media Defendants. .............................................................32

2. The Family's Lawsuit Against Shah Was Not The Subject Of Public Discussion Nor Impacted Third Parties in 2008..........35

B. There Is No Separate "Constitutional" Fair-Report Privilege. ................37

CONCLUSION ..........................................................................................................38

CERTIFICATE OF COMPLIANCE .......................................................................40

CERTIFICATE OF SERVICE ................................................................................40

# INDEX OF AUTHORITIES

**Page(s)**

CASES

*Bierman v. Weier*,
826 N.W.2d 436 (Iowa 2013) ................................................................ 35

*Burrill v. Nair*,
217 Cal.App.4th 357 (Cal. Ct. App. 2013) ............................................ 17

*Butler v. Hearst-Argyle Television, Inc.*,
49 S.W.3d 116 (Ark. 2001) .................................................................... 17

*Cain v. Hearst Corp.*,
878 S.W.2d 577 (Tex. 1994) .................................................................. 36

*Cantey Hanger, LLP v. Byrd*,
467 S.W.3d 477 (Tex. 2015) .................................................................. 24

*Casso v. Brand*,
776 S.W.2d 551 (Tex. 1989) .................................................................. 12

*Cole v. Huntsville Mem'l Hosp.*,
920 S.W.2d 364 (Tex. App.—Houston [1st Dist.] 1996, writ
denied) .................................................................................................... 13

*Cox Broadcasting Corp. v. Cohn*,
420 U.S. 469 (1975) ............................................................................... 38

*Crites v. Mullins*,
697 S.W.2d 715 (Tex. App.—Corpus Christi 1985, writ ref'd
n.r.e.) ........................................................................................... 12, 15, 16

*Crumrine v. Harte-Hanks Television, Inc.*,
37 S.W.3d 124 (Tex. App.—San Antonio 2001, pet. denied) ............... 36

*Cullum v. White*,
399 S.W.3d 173 (Tex. App.—San Antonio 2011, pet. denied) ............. 28

*Dameron v. Washington Magazine, Inc.*,
779 F.2d 736 (D.C. Cir. 1985) ................................................................ 9

*Einhorn v. LaChance*,
    823 S.W.2d 405 (Tex. App.—Houston [1st Dist.] 1992, writ
    dism'd w.o.j.) ................................................................................... 36

*Flatley v. Mauro*,
    139 P.3d 2 (Cal. 2006) ................................................................... 23

*Goss v. Houston Cmty. Newspapers*,
    252 S.W.3d 652 (Tex. App.—Houston [14th Dist.] 2008, no
    pet.) ............................................................................................ 14, 27

*Granada Biosciences, Inc. v. Forbes, Inc.*,
    49 S.W.3d 610 (Tex. App.—Houston [14th Dist.] 2001), *rev'd*,
    124 S.W.3d 167 (Tex. 2003) ........................................................ 38

*Harvest House Publishers v. Local Church*,
    190 S.W.3d 204 (Tex. App.—Houston [1st Dist.] 2006, pet.
    denied) .......................................................................................... 13

*Kaufman v. Islamic Soc'y of Arlington*,
    291 S.W.3d 130 (Tex. App.—Fort Worth 2009, pet. denied) ........ 12

*Langston v. Eagle Printing Co.*,
    797 S.W.2d 66 (Tex. App.—Waco 1990, no writ) ........................ 37

*Langston v. Eagle Publ'g Co.*,
    719 S.W.2d 612 (Tex. App.—Waco 1986, writ ref'd n.r.e.) ......... 14

*Lassiter v. Lassiter*,
    456 F.Supp.2d 876 (E.D. Ky. 2006), *aff'd*, 280 F. App'x 503
    (6th Cir. 2008) .............................................................................. 35

*Likover v. Sunflower Terrace II, Ltd.*,
    696 S.W.2d 468 (Tex. App.—Houston [1st Dist.] 1985, no writ) ...... 22

*Main v. Royall*,
    348 S.W.3d 381 (Tex. App.—Dallas 2011, no pet.) ..................... 12

*Missner v. Clifford*,
    914 N.E.2d 540 (Ill. App. Ct. 2009) ............................................. 17

*Neely v. Wilson*,
    418 S.W.3d 52 (Tex. 2013) ........................................... 26, 27, 28, 37

*Newspaper Holdings, Inc. v. Crazy Hotel Assisted Living, Ltd.*,
    416 S.W.3d 71 (Tex. App.—Houston [1st Dist.] 2013, pet.
    denied) .......................................................................................... 15

*R.A.V. v. City of St. Paul*,
    505 U.S. 377 (1992) ..................................................................... 23

*Randall's Food Markets, Inc. v. Johnson*,
    891 S.W.2d 640 (Tex. 1995) ........................................................ 14

*Raymer v. Doubleday & Co.*,
    615 F.2d 241 (5th Cir. 1980) ....................................................... 15

*Republic Tobacco Co. v. North Atl. Trading Co.*,
    381 F.3d 717 (7th Cir. 2004) ....................................................... 17

*Service Emps. Int'l Union v. Prof'l Janitorial Serv. of Houston, Inc.*,
    415 S.W.3d 387 (Tex. App.—Houston [1st Dist.] 2013, pet.
    denied) ................................................................................... 32, 33

*Texas Monthly, Inc. v. Transamerican Natural Gas Corp.*,
    7 S.W.3d 801 (Tex. App.—Houston [1st Dist.] 1999, no pet.).......... 15, 16, 30

*Traweek v. Radio Brady, Inc.*,
    441 S.W.2d 240 (Tex. Civ. App.—Austin 1969, writ ref'd
    n.r.e.) ........................................................................................... 13

*United States v. Quinn*,
    514 F.2d 1250 (5th Cir. 1975) ..................................................... 23

*Waring v. William Morrow & Co.*,
    821 F.Supp. 1188 (S.D. Tex. 1993)............................................. 15

*Wavell v. Caller-Times Publ'g Co.*,
    809 S.W.2d 633 (Tex. App.—Corpus Christi 1991, writ denied)................. 36

*WFAA-TV, Inc. v. McLemore*,
    978 S.W.2d 568 (Tex. 1998) ........................................................ 36

*ZS Assocs., Inc. v. Synygy, Inc.*,
    2011 WL 2038513 (E.D. Pa. 2011) .............................................. 17

**STATUTES**

Tex. Civ. Prac. & Rem. Code §22.021 ............................................................... 13, 34

Tex. Civ. Prac. & Rem. Code §27.001(7)................................................................ 34

Tex. Civ. Prac. & Rem. Code §51.014(a)(6) ...................................................... 12, 33

Tex. Civ. Prac. & Rem. Code §73.002 ............................................................ *passim*

**OTHER AUTHORITIES**

Restatement (Second) of Torts §611 (1977)............................................................. 14

Restatement (Second) of Torts §611 cmt. c (1977).......................................... 16, 17

Restatement (Second) of Torts §611 cmt. f (1977) .................................................. 30

## INTRODUCTION

Appellees' brief makes two things clear about this appeal. First, the issue in this case is whether *Monster in River Oaks* is privileged as a fair report of the 2008 trial. The second is that the book is not a fair report of the trial; in fact, it is not—and was never meant to be—a report of a trial at all.

The fair-report privilege is an affirmative defense and thus it was Appellees' burden to file a traditional motion for summary judgment and conclusively establish as a matter of law every element of the defense is satisfied. Appellees failed to do so. They did not outline for the district court each element of the fair-report privilege nor did they present conclusive, uncontroverted evidence of each element. In particular, they failed to conclusively establish a lack of malice.

Finally, Appellees claim that whether their book is a fair report the Court to examine the "context" of the statements in the book. Appellees' admission that the book's statements must be judged against a broader context shows that there is at least a genuine issue of material fact on which reasonable persons can disagree about the applicability of the fair-report privilege in this case. The district court erred in granting summary judgment because whether the book is a fair report is a fact question for a jury.

## I. *Monster In River Oaks* Was Not A Fair Report

### A. It Was Difficult For Appellees To Find Trial References Because The Book Was Not A Report Of The Trial.

Appellees' brief shows that the book was not a report of a trial. Appellees complain about how difficult, time-consuming and "tedious" it was to find references in the 2008 trial record that allegedly "prove" the defamatory statements about the Johnson family in *Monster in River Oaks*. (Appellees' Br. at 1, 30, 32) This complaint inadvertently proves that the book is not a fair report. If it were a report of a trial, it should have easy to show that the testimony and events at trial actually happened as they were reported. Appellees found this "tedious" because the book is not a report of the trial. Most of the defamatory statements in the book are not reported as trial testimony or other trial evidence. Rather, the defamatory statements are made as statements of fact without reference to the trial proceedings.

What Appellees have done is an after-the-fact attempt to justify their defamatory book by trying to link the particular statements to something from a public record. But this is exactly what the fair-report privilege does not permit. "The privilege should not be interpreted to protect unattributed, defamatory statements supported after-the-fact through a frantic search of official records." *Dameron v. Washington Magazine, Inc.* 779 F.2d 736, 739 (D.C. Cir. 1985) (internal quotation marks omitted).

**B.** **As A Simple Example Of Why Appellees Cannot Be Trusted, Most Of The "Sixteen Trial Exhibits" In The Book's Appendix Were Not Exhibits At The Trial.**

To bolster their claim that *Monster in River* Oaks is a fair report, Appellees say: "Sixteen trial exhibits are reproduced in the Book's Appendix." These sixteen documents are at the end of the book. CR.Supp2d.300-14. But in fact most of these documents were not trial exhibits. The book's appendix is a good example of how Appellees made things up in what they now claim is a "fair report" of the trial.

There is no record that eleven of these sixteen exhibits were ever marked or offered at the trial. As the Court knows, a trial exhibit must be marked with an exhibit label. If an exhibit is offered into evidence during a trial, the official court reporter notes this in the transcript, along with whether anyone objects to the exhibit and the court's ruling on whether or not the exhibit is admitted into evidence. When the court reporter prepares the trial transcript, the exhibits offered by the parties are summarized as part of the index to the transcript.

After the 2008 trial, Shah filed a notice of appeal. The court reporter prepared the record, including a Master Index. CR.Supp2d.318-32. According to this index, only five of the sixteen documents in the appendix to *Monster In River Oaks* were marked as exhibits at the 2008 trial.

Six of the sixteen do not show any exhibit label. CR.Supp2d.305, 309-12. The handwritten memo, CR.Supp2d.300, is not labelled but was Defendant's Exhibit 1 at trial. The rest do have labels, and can be compared to the exhibits listed in the index. CR.Supp2d.326-31.

Remarkably, although the book's appendix shows trial exhibit labels for exhibits numbered 68, 66, 33, 78 and 211, CR.Supp2d.301-02, 304, 306, 314, not one of these exhibits is on the index. CR.Supp2d.330-31. Appellees thus published as "Trial Exhibits" documents that were ***not*** exhibits at the 2008 trial.

As one example of how these were used, Appellees state that Kaleta had trouble making friends and was shunned by her classmates' parents. Kaleta attended the Kinkaid School for prekindergarten, but was accepted at St. John's for its kindergarten class. Joan decided that St. John's was the better choice for Kaleta. In *Monster in River Oaks*, Appellees falsely cast this as a decision based on Kinkaid carpool politics. "In a fit of anger, Joan pulled Kaleta out of Kinkaid." CR.3274, CR.Supp2d.85. In the book's appendix, Defendants quoted and reproduced a letter from Kinkaid's headmaster, with the caption "Carpool controversy results in Kaleta's withdrawal from elite school." CR.Supp2d.306. Appellees' sole support for this passage was this purported "DS 78." CR.2072-74. But there was no such exhibit at the trial. CR.Supp2d.330. These statements about a five-year-old girl are defamatory. They also defame Joan by calling her

11

irrational and "childish." This passage does not refer to the trial evidence in any way and thus cannot be a fair report.

**C.** ***Monster In River Oaks* Is Not A Newspaper Or Periodical, So The Statutory Fair-Report Privilege Does Not Apply.**

In the district court, Appellees relied on §73.002 of the Texas Civil Practice & Remedies Code, a statutory privilege applicable to "publication by a newspaper or other periodical…." As the family explained in their opening brief, this statutory privilege does not apply to private persons. *Casso v. Brand*, 776 S.W.2d 551, 553 (Tex. 1989). *Monster in River Oaks* is not a newspaper or periodical, and §73.002 is inapplicable.

Appellees incorrectly claim that the statutory privilege has been extended by the courts to "all forms of print and broadcast media." Appellees' Br. at 9. But their authorities do not support their claim. The primary case they rely on is *Main v. Royall*, 348 S.W.3d 381 (Tex. App.—Dallas 2011, no pet.), which did not even purport to interpret §73.002. *Royall* addressed whether a writer or publisher of a book was a member of the "electronic or print media" for purposes of Section 51.014(a)(6), which governs interlocutory appellate jurisdiction. *Id.* at 386-87. It never said or suggested that a book is a "newspaper" or "periodical" under §73.002.

Appellees' other cases and statutes are similarly inapplicable. *Crites v. Mullins*, 697 S.W.2d 715, 717 (Tex. App.—Corpus Christi 1985, writ ref'd n.r.e.)

12

was a suit against a newspaper publisher. *Traweek v. Radio Brady, Inc.*, 441 S.W.2d 240, 241 (Tex. Civ. App.—Austin 1969, writ ref'd n.r.e.) was a breach-of-contract case, not a libel case. And *Kaufman v. Islamic Society of Arlington*, 291 S.W.3d 130 (Tex. App.—Fort Worth 2009, pet. denied) addressed a different statute governing appellate jurisdiction. Nor did *Harvest House Publishers v. Local Church*, 190 S.W.3d 204 (Tex. App.—Houston [1st Dist.] 2006, pet. denied) somehow suggest that §73.002 applied to book publishers and authors. *Harvest House* never mentions §73.002 nor did it use the phrase "print media" as Appellees suggest in their brief. *Id*. at 210-17. That Texas Civil Practice and Remedies Code §22.021(3) defines "news medium" to include a "book publisher" is similarly irrelevant because §73.002 does not apply to any news medium but instead was expressly limited to newspapers and periodicals.

In short, Appellees ask this court to ignore the well-settled rule that courts cannot expand a statute beyond its text. *Cole v. Huntsville Mem'l Hosp*., 920 S.W.2d 364, 372 (Tex. App.—Houston [1st Dist.] 1996, writ denied). "If a statute refers to a person, thing, or consequence, it excludes all others." *Id.* Here, the Legislature specifically chose to refer to newspapers and periodicals. Appellees' book is neither and thus not entitled to the statutory privilege.

Appellees' reliance on general First Amendment cases that did not involve §73.002 is similarly misplaced. While Appellees may think the Legislature's

13

decision is "nonsensical," the statutory privilege, by its express terms, does not apply to anything other than a newspaper or periodical, and *Monster in River Oaks* is neither.

**D.      Appellees Did Not Address Or Carry Their Burden Of Proving The Affirmative Defense Of The Common Law Fair-Report Privilege.**

The common law fair-report privilege is based on Section 611 of the Restatement (Second) of Torts. *Goss v. Houston Cmty. Newspapers*, 252 S.W.3d 652, 655 (Tex. App.—Houston [14th Dist.] 2008, no pet.). Section 611 states that a report of an official, public proceeding that deals with a matter of public concern is privileged "if the report is accurate and complete or a fair abridgement of the occurrence reported." Restatement (Second) of Torts §611 (1977).

Appellees did not discuss any elements of the common law fair-report privilege in the district court. There, they made only a passing reference to the fair-report privilege. CR.536-537. As explained in the family's opening brief, Appellees did not discuss the requirements of this fair-report privilege in their summary judgment motion, and did not conclusively establish every element of this affirmative defense, particularly the absence of malice.

A defendant can only claim the benefit of a fair-report privilege if he acts without malice. *Randall's Food Markets, Inc. v. Johnson*, 891 S.W.2d 640, 646 (Tex. 1995). As an element of an affirmative defense, absence of malice must be

14

conclusively established by the defendant. *Langston v. Eagle Publ'g Co.*, 719 S.W.2d 612, 625 (Tex. App.—Waco 1986, writ ref'd n.r.e.).

**1.    By Excusing Their Work As "Devices And Characterizations," Appellees Acknowledge That They "Embellished" Any Descriptions Of The 2008 Trial.**

Appellees argue that *Monster In River Oaks* includes "devices and characterizations" that do not prevent it from being a fair report. (Appellees' Br. at 18-23)  First, their authorities do not involve the §611 common-law fair-report privilege. Two of the cases—*Crites v. Mullins* and *Texas Monthly, Inc. v. Transamerican Natural Gas Corp.*, 7 S.W.3d 801 (Tex. App.—Houston [1st Dist.] 1999, no pet.)—interpret the statutory privilege. Of course, that statute is inapplicable because the book is not a newspaper or periodical. Similarly, the federal cases they cite did not involve any version of a fair-report privilege. *Raymer v. Doubleday & Co.*, 615 F.2d 241 (5th Cir. 1980); *Waring v. William Morrow & Co.*, 821 F.Supp. 1188 (S.D. Tex. 1993). Finally, *Newspaper Holdings, Inc. v. Crazy Hotel Assisted Living, Ltd.*, 416 S.W.3d 71 (Tex. App.—Houston [1st Dist.] 2013, pet. denied), also failed to address the fair-report privilege, but relied on the Texas Citizens' Participation Act, which is neither applicable nor a basis on which Appellees relied below.

In addition, the cases Appellees cite discussing "exaggeration" did so as dicta. In *Crites*, the published statements referred to "assault" and a "beating."  697

15

S.W.2d at 717. The hospital record the newspaper reported said that the victim suffered injuries "'apparently' caused by a beating 'at the hands of her husband.'" *Id.* The newspaper did not add to, embellish or exaggerate the hospital report. Likewise, in *Texas Monthly v. Transamerican,* the magazine reported that the company owner wiretapped the phones of his employees when it was undisputed that he had secretly recorded their calls. 7 S.W.3d at 807. It said that he was "cook[ing] the books" when the company's Chief Financial Officer testified that the financial disclosures were not accurate, were misleading and that the company engaged in numerous dishonest accounting practices. *Id.* at 809-10. From the court's detailed descriptions, "cooking the books" was an understatement, not an exaggeration.

By defending their statements as "devices," "characterizations" and "exaggeration," Appellees admit that they embellished the few parts of the book that referred to the 2008 trial. Thus, they lost any protection from the fair-report privilege.

### 2. Appellees Are Attempting To Self-Confer The Fair-Report Privilege.

Moreover, contrary to what Appellees' suggest, this privilege is not something that Appellees can confer upon themselves. Comment c to §611 of the Restatement provides that:

> A person cannot confer this privilege upon himself by making the original defamatory publication himself and then reporting to other people what he had stated. This is true whether the original publication was privileged or not. Nor may he confer the privilege upon a third person, even a member of the communications media, by making the original statement under a collusive arrangement with that person for the purpose of conferring the privilege upon him.

Restatement (Second) of Torts §611 cmt. c (1977).

Every court that has considered whether a libel defendant can self-confer the privilege has followed comment c. *See Republic Tobacco Co. v. North Atl. Trading Co.*, 381 F.3d 717, 732 (7th Cir. 2004); *Missner v. Clifford*, 914 N.E.2d 540, 551 (Ill. App. Ct. 2009); *Burrill v. Nair*, 217 Cal.App.4th 357, 397-98 (Cal. Ct. App. 2013); *ZS Assocs., Inc. v. Synygy, Inc.*, 2011 WL 2038513 (E.D. Pa. 2011); *Butler v. Hearst-Argyle Television, Inc.*, 49 S.W.3d 116, 121-22 (Ark. 2001). Appellees offer no reason why Texas should stand alone in allowing parties to self-confer the fair-report privilege. There is no public policy advanced by allowing defendants to make or collude in the original libel, and then republish it in the guise of merely "reporting" a trial.

But Appellees would ask the Court to adopt a different rule that would allow defendants to self-confer. Appellees' Brief at 14-15. Nevertheless, Appellees go on to deny that they have self-conferred the fair-report privilege. First, they urge that the comment (c) exception is restricted to when "the defamer *illegitimately*

17

*fabricated or orchestrated events…*" Appellees' Br. at 14. While some jurisdictions have made this a requirement, comment (c) does not include it. *See* Appellants' Br. at 15. Second, Appellees suggest that comment (c) is inapplicable because they did not "initiate" the trial. Appellees' Br. at 15. But comment (c) imposes no such limitation. Appellees offer no reason for why when a victim sues a child molester, the molester's lawyer can collude in libeling the victim after the trial.

Appellees also argue that Phillips did not illegitimately fabricate or orchestrate events, and that the defamatory statements were uttered by witnesses called by the plaintiffs in the Shah trial. Appellees' Br. at 15. The chart in their brief (at 16) cites to testimony by the plaintiffs' witnesses, but the testimony either comes from cross examination of these witnesses by Phillips and his partner or grossly mischaracterizes the testimony that was actually offered.

The first entry on the chart, "Joan admits kicking her children," is a prime example of how Philips attempts to self-confer the privilege. At trial, Phillips asked Joan Johnson if she was the person "doing the beating" of her children. CR.Supp2d. 2263. Joan denied it. Phillips attempted to impeach by asking whether she had ever kicked Kaleta. Joan said yes, but not hard enough to leave a mark. In the book, Phillips stated that Joan took out her rage on the children, CR.Supp2d 156, and that striking a child without leaving a mark was "her admission and

18

detailed explanation of how to discreetly abuse a child…" *Id.* at 157. But Joan never said this; these were Phillips' questions.

The second entry, "Joan admits striking Seth in the face," cites a transcript from before the 2008 trial that was attached to Phillips' affidavit in the district court. CR 3083-3200. It has an exhibit label, "DS 59," and Phillips swore that it was "DX 59 at the Shah Trial." CR 3070. Like the bulk of the "Trial Exhibits" in the book's appendix, this document is not on the 2008 trial's court reporter's index of offered defense exhibits. CR.Supp2d.330.

The next two entries are also from Phillips' cross examinations. But as stated in the book and the chart, these are not fair reports. The chart says Kaleta "Wrote memo to Mom: no screaming, violence or kicking." When shown this by Phillips at trial, Kaleta did not remember writing it, but that "I have a feeling that's dictated to me." CR.Supp2d.2119. Phillips asked what she meant, and she said: "Someone like your client, sir." *Id.* In the book, Phillips never referred to this testimony in the book.

The next entry says of Wirt, "Stabbing photo of his mother." In the book, this is related as fact, with no reference to how Shah instigated the incident. *Compare* CR.Supp2d.97 *with* CR.Supp2d.1999-2000 (Wirt testifying that Shah had put a "club device" on Wirt's car and had lied to Wirt, saying his mother had done it). The fifth entry was related to the book's statement that Kaleta had hit

19

her brother in the head with a baseball bat while in the back seat of the family car. CR.Supp2d.87. But the testimony cited on Appellees chart is about one kid throwing a keychain at another.

"Joan whipped Seth once or twice" has no apparent link to any statement in the book. But the trial transcript shows that Seth was testifying about how Shah "belted him." His lawyer asked if he had ever been "whipped" by his parents, and he said "Maybe once or twice, not as powerful or as hard as he had hit me." CR.Supp2d.2292-93. Appellees apparently included this to continue claiming that Joan Johnson was the real cause of her children's injuries. But the actual transcript is not what Appellees suggests

The family identified 29 statements in the book constituting a gist that Joan Johnson allowed Shah and David Collie to abuse her children. CR.3211, 3261-71. Three items in Appellees' chart purport to document this. But in every instance the entries leave out testimony that Joan was terrified of Dinesh Shah:

| | |
|---|---|
| Seventh Entry: | "Joan endured beatings herself and witnessed Shah beat her children many times." |
| Joan's Testimony: | "I was really afraid of him in 2002. He was getting very, very scary." CR.Supp2d.2236. |
| | |
| Eighth Entry: | "Officer questions why Joan Johnson failed to protect her children." |
| Officer's Testimony: | "She said she was just too afraid of Mr. Shah." CR.Supp2d.764. |
| | |
| Ninth Entry: | "Joan failed to protect her kids." |

20

Officer's Testimony: "… obviously, they were terrified of this guy."
CR.Supp2d.797.

This testimony is in the very pages that Appellees cite to back up their chart. But the chart's omission of this testimony makes it just as unfair a report as the book.

The second to last item in the chart states that Dr. Farley said: "Kids were abused 'by Mr. Shah and Mrs. Johnson." In the cited part of the transcript, Phillips followed up with Dr. Farley on this. Dr. Farley explained: "Well, Mrs. Johnson was the only reason the guy was in the house." CR.Supp2d.2382. Once again, Appellees write their brief like they wrote their book. Dr. Farley was not accusing Joan Johnson of abusing her children, but anyone who trusts Appellees to fairly report the trial would think that was what he meant.

The family also showed that the Appellees defamed Joan Johnson by stating that Joan Johnson could have protected her children if she had been "a little more mature in her friendships and romantic relationships…" CR.Supp2d.3275. This part of the book does not refer at all to the trial and cannot be a report, fair or otherwise. Appellees quote Dr. Farley's testimony that "Joan was 'a plum to pluck,' very immature." The transcript includes further testimony as to whether there were circumstances that exposed Joan to "allowing an outsider into the home?" Dr. Farley said "She was really a woman who had lost a husband and is in many ways an immature person." CR.Supp2d.2357. By omitting this explanation, the book does not even fairly characterize Dr. Farley's testimony.

21

Two items on the chart, "Joan was unable to protect her children; Stockholm Syndrome" and "Seth was sexually abused by Shah," involve facts at the 2008 trial. The family does not claim that these are defamatory.

Appellees cross-examination questions followed through on the threats in the May 9, 2008 letter. "Shah is in possession of a vast amount of <u>original</u> documents concerning the business and personal dealings between and among Joan Johnson, Seth Johnson, Kaleta Johnson and Wirt Blaffer, documentary evidence that Mr. Shah believes will be damaging to them." CR.3427-29 (emphasis in original). "Mr. Shah believes that Ms. Johnson, Seth Johnson and Kaleta Johnson would be embarrassed to see these documents admitted into evidence during the trial of the case," and offered to "deliver to plaintiffs all of the Johnson's original documents that Mr. Shah has," if Kaleta and Seth Johnson dismiss their lawsuit with prejudice and pay Shah $250,000. A reasonable jury could, and doubtless would, conclude that Appellees carried out their extortion threat through their conduct at trial and Phillips' subsequent writing of the book.

Next, Appellees claim that the extortion demand was merely part of "aggressive settlement negotiations…." Appellees' Br. at 17. But as the family addressed in its opening brief, courts have rejected the idea that lawyers have a special right to commit extortion. In *Likover v. Sunflower Terrace II, Ltd.*, 696 S.W.2d 468, 474 (Tex. App.—Houston [1st Dist.] 1985, no writ), a lawyer and his

22

client were both found liable for conspiracy to extort money to which they were not entitled, based on a false claim of breach of contract. In *Flatley v. Mauro*, 139 P.3d 2, 19-24 (Cal. 2006), the California Supreme Court held that an attorney's letter, though couched as settlement demand, was extortion and not constitutionally protected speech. The California Supreme Court followed *R.A.V. v. City of St. Paul,* 505 U.S. 377, 420 (1992) (Stevens, J., concurring) ("Although the *First Amendment* broadly protects 'speech,' it does not protect the right to ... 'extort'"); *United States v. Quinn,* 514 F.2d 1250, 1268 (5th Cir. 1975) ("It may categorically be stated that extortionate speech has no more constitutional protection than that uttered by a robber while ordering his victim to hand over the money, which is no protection at all.").

In each of these cases, the lawyers' clients were asserting some claim. Likover's client did have a contract with the victims, although the contract had not been breached. The California lawyer's client at least claimed that she had been sexually assaulted by the target of the extortion. Here, Dinesh Shah had never asserted any independent claim against Seth or Kaleta Johnson. If Appellees want to argue that the May 9, 2008 letter was not an extortion demand, they should have to convince a jury. In order to affirm the summary judgment on this basis, the Court will have to find that the May 9, 2008 letter could not be extortionate as a matter of law. Appellees understandably shy away from saying this, but they are

23

asking this Court to endorse their extortion demand as just another tactic that any good lawyer ought to use to zealously represent a client.

      **3.**    **Appellees Do Not Have Immunity As Attorneys To Defame Opposing Parties By Publishing A Book Years After They Stopped Representing Their Child Molesting Client.**

Appellees' suggestion that attorney immunity or judicial-proceedings immunity somehow affects the fair-report privilege is wholly misplaced and misunderstands both the law and the family's claims in this case. The alleged defamatory statements in this case were statements made by Phillips two years after the trial ended. The family does not and has not alleged a defamation claim based on statements made in court or during the litigation between Shah and the Johnson children. Rather, the defamation claims are based on defamatory statements Phillips made in the book long after the civil trial had ended. Attorney immunity is wholly inapplicable to Phillips' conduct in writing and self-publishing the book because immunity only applies to acts done by a lawyer in discharge of his obligations to his client. *Cantey Hanger, LLP v. Byrd*, 467 S.W.3d 477, 484 (Tex. 2015).

The relevance of what Appellees characterize as an "aggressive" settlement demand is two-fold. First, it shows that Phillips acted with malice when he wrote and self-published the book. He made a threat and after the civil case had ended, he carried it out. Second, the extortion demand along with Phillips' conduct during

24

trial raises at least a fact issue over whether Phillips conduct at trial was an attempt to create a record of defamatory statements during the court proceeding so he could later carry out his threat after the case was over and try to hide behind the fair-report privilege. But this does not mean Appellees are being held liable for making the demand. Rather, it is simply evidence of Appellees' attempt to self-confer the privilege.

Moreover, if attorney immunity or judicial-proceedings immunity swept as far as Appellees suggest, then the self-conferral limit on the fair-report privilege would be a dead letter. The entire point of the self-conferral limitation is that a person cannot make false or defamatory statements in a privileged or protected context so that he can later go out and repeat them elsewhere and hide behind the fair-report privilege. Thus, it is unsurprising that Appellees can cite no authority for its suggestion that attorney or judicial-proceedings immunity allows a lawyer to self-confer the fair-report privilege. To reach such a holding would be to abolish the self-conferral limit.

## II. *Monster In River Oaks* Defames The Family.

### A. Appellees' Own Descriptions Of The Book Show That Its Gist Is Defamatory.

In the opening brief, the family showed that Appellees' own descriptions of *Monster In River Oaks* show that the gist of the book is defamatory. Opening Br. at 22-27. Appellees respond that these statements must be discounted by the Court

as "opinion" and that they are "testimonials." Appellees' Br. at 23-26. But Appellees' argument fails because a defendant's description of its own publication is evidence of the publication's gist. *Neely v. Wilson*, 418 S.W.3d 52, 72 (Tex. 2013).

Appellees claim that the "reasonable reader understands that reviews on a dust jacket are the opinions of the reviewer, design (sic) to promote interest and draw a reader's attention to the full story within." Appellees' Br. at 26. To say that the dust jacket statements do not state the gist of the book is absurd; by Appellees' own description, their purpose is to show potential readers *what the book is about*. Appellees adopted, ratified *and published* these statements to describe their book. As the Supreme Court observed in *Neely*, "…an introduction can be especially misleading." 418 S.W.3d at 65.

Appellees urge that every reasonable reader would see the book as Appellees now describe it, not as they described it when they were trying to sell it. The "reasonable reader's understanding of the book is, at least a question of fact that precluded summary judgment.

Similarly, Appellees' repeated calls for the Court to examine the "context" of their defamatory statements inadvertently acknowledges that there are, at a minimum, fact questions about whether these statements are defamatory that cannot be decided by a court on summary judgment.

26

### B.   Plaintiffs Are Not Restricted To Alleging Only One Defamatory Statement.

Appellees argue that the family's defamation claims somehow fail because they have alleged that too many statements in *Monster in River Oaks* are defamatory. Appellees' Br. at 1-2. They urge that a plaintiff is limited to "a clear and concise statement of the alleged defamation…." Appellees' Br. at 1. No Texas case has ever imposed a limit on the number of individual statements that a plaintiff can allege are defamatory in a single publication. This is not a case about a single newspaper article, such as *Goss v. Houston Community Newspapers*, 252 S.W.3d 652 (Tex. App.—Houston [14th Dist.] 2008, no pet.), or a seven-minute television broadcast as in *Neely v. Wilson*, 418 S.W.3d 52 (Tex. 2013). In fact, the libel cases involving genuine fair reports by actual media defendants usually involve only one or a handful of allegedly defamatory statements. Such publications themselves are brief and focus on one theme or issue.

In this case, Appellees attacked the two plaintiffs at trial, Seth and Kaleta, and their mother and older brother. They had 50,000 pages of stolen documents and possibly more failed trial strategies to work with. Appellees spent over two years writing the nearly 300 page *Monster in River Oaks*. The book makes both sweeping defamatory statements about the family and its individual members, and detailed particularized libels.

In *Cullum v. White*, 399 S.W.3d 173 (Tex. App.—San Antonio 2011, pet. denied), a website was the subject of a libel case. Even though the website was much shorter than Appellees' nearly 300 page book, the court detailed dozens of individual statements to support its holding that the website was defamatory as a whole. *Id.* at 180-83. In this case, the family followed the Texas Supreme Court's holding in *Neely* that a publication can have more than one defamatory gist. 418 S.W.3d at 66 n.20. As Appellees acknowledge, the family presented the defamatory statements in *Monster in River Oaks* in nine separate gists.

## C. Appellants Have Fully Addressed The Gist-Specific And Statement-Specific Arguments In Their Opening Brief.

Appellees spend pages much of their brief responding to the various gist- and statement-specific arguments. A point-by-point response here is unnecessary as the family's opening brief anticipated the arguments that Appellees would make and addresses these arguments. But a few observations are in order.

First, much of Appellees' arguments regarding the truth or falsity of certain statements are based on a failure to actually respond to the entirety of the statements that the family alleges to be defamatory. For example, on page 36 of their brief, Appellees' characterize Statement 9 as simply that "Wirt kicked Joan's car." But as the family explained in its opening brief, the statement as a whole was far broader than that and the false and defamatory part of the statement was not that Wirt kicked the car, but rather the false and defamatory reasons the book

28

ascribed to why it occurred. Appellant's Br. at 37. Appellees, however, do not even defend the false and defamatory part of Statement 9.

Another example of Appellees only addressing part of a statement and ignoring the part of the statement that made it defamatory and for which they offer no evidence of truth can be found at pages 35-36 where Appellees' address Statement 16. According to Appellees' Statement 16 was simply that Ms. Johnson kicked her children. Appellees' Br. at 35-36. As explained in opening brief, Statement 16 went far beyond this and falsely claimed that Joan ignored the abuse others were inflicting on her children and that Joan regularly abused her children in a manner that was intended to not leave marks or bruises. Appellants' Br. at 36-37. But here again, Appellees' fail to address the part of the statement or gist that the family claims was defamatory.

Moreover, even if Appellees' could somehow defend certain specific statements within the nearly 300 page book, this is not sufficient to overcome the gist of the book as a whole. Nowhere do Appellees defend the truth of the book as a whole and, in fact they admit that there are embellishments and "literary devices" within the book. Appellees' Br. at 18-23.

Similarly, Appellees' statement-specific, fair-report arguments fail for reasons that the family anticipated in their opening brief. *See, e.g.*, Appellants' Br. at 45-47. To point to two examples, Appellees' defend Phillips' defamatory

allegations that Kaleta and Seth gave false testimony as protected by the fair-report privilege. Appellees' Br. at 40-42. But Appellees' argument is simply to recite trial testimony and then claims that the testimony begs credulity. But this simply misses the point. First, the fair-report privilege does not protect an author's statements that "indict expressly or by innuendo the veracity or integrity of any of the parties." Restatement (Second) of Torts §611 cmt. f (quoted at Appellants' Br. at 45). Whether Phillips thinks his indictment is true does not affect the fair-report-privilege analysis. Moreover, the fact that Phillips has to argue that the evidence was false by suggesting that testimony of non-recall was "at least curious" underscores that even if the fair-report privilege could be applicable, it would be a fact question for the jury.

One other argument that requires a brief response is that Statement 13 that the "children suffered from neglect and physical abuse" is protected by the fair-report privilege. *See* Appellees' Br. at 33-34. Appellees rely on *Texas Monthly, Inc. v. TransAmerican Natural Gas Corp.*, to argue that Statement 13 is protected by the fair-report privilege because it is not necessary to repeat attribution to testimony in every sentence of a paragraph. But the very text from the book Appellants quote shows that the paragraph at issue specifically referred to trial testimony. 7 S.W.3d at 810 ("Stone went down a long list of 'accounting irregularities' that he discovered after he took the job. The purpose of these

30

irregularities, Stone told the jury, was to create a cash flow that would permit Stanley to expand his business outside the jurisdiction of the bankruptcy court."). The paragraphs from the book that are block quoted on page 33 of Appellees' Brief, however, never mention that any of these statements or claims were made in Shah's testimony to the jury.

Appellees repeatedly urge that whether their book is a fair report requires examination of the "context" of the statements in the book. This admission that the book's statements must be judged against a broader context shows that, at a minimum, there is a genuine issue of material fact on which reasonable persons can disagree about whether the fair-report privilege applies to all or any parts of the book.

## III. Appellees' First Amendment Arguments Are Unavailing.

### A. Appellees Have The Burden Of Proving Truth And Absence Of Malice, Which They Will Not Be Able To Do.

Appellees claim that it was the family's burden to prove both the falsity of the defamatory statements, and that Appellees acted with actual malice. Appellees' Br. at 12-13. But Appellees are incorrect and, in fact, it was their burden to prove the truth and absence of malice. A libel plaintiff only has the burden of proof on these issues when (1) the defendant is a media defendant and (2) the defamation was on a matter of public concern. But Appellees are not media defendants and *Monster In River Oaks* was not about a matter of public concern.

31

### 1. Appellees' "Self-Published" Book Precludes Them From Being Media Defendants.

Appellees make the astonishing claim that they are media defendants. Appellees' Br. at 10-12. They base this on the fact that the statements were printed and bound in the form of a hardcover and digital book.

The cases using the term "media defendant" for purposes of assessing First Amendment protections are not identical to the statutory terms used by the Texas legislature in describing who can pursue an interlocutory appeal under Texas law. But since Appellees want to rely on those cases, they should have to acknowledge the most recent decision on the subject by a Houston Court of Appeals. In *Service Employees International Union v. Professional Janitorial Service of Houston, Inc.*, 415 S.W.3d 387 (Tex. App.—Houston [1st Dist.] 2013, pet. denied), the court held that a union local was not a "member of the electronic or print media" merely because it maintained a website. The court dismissed the union's interlocutory appeal for lack of jurisdiction under Texas Civil Practice and Remedies Code §51.014(a)(6), which limits interlocutory appeals in libel cases to members of the electronic or print media.

This court analyzed the term "electronic media" both from the text of the statute, the legislative history, and the case authorities. The legislative history stated that the purpose of the amendment was to offer interlocutory appeal to permit "a newspaper, radio station or television station" or "traditional 'media

32

compan[ies].'" *Id.* at 397-98. Before §51.014(a)(6) was enacted, the Texas Supreme Court used the term "media defendant" in reference to traditional media, such as newspapers, television stations, television reporters and journalists. *Id.* at 397-98 & n.10. The court concluded that the person who communicates online qualifies as a member of the electronic media when the person's primary business is reporting the news. *Id.* at 398. The Court then set out facts to consider in determining whether an author's primary business is reporting the news. *Id.* at 398-99. The Court concluded:

> But a person who prints and distributes one million copies of a flyer may not be a member of the media despite his or her breadth of readership.

*Id.* at 399.

Under this Court's test, Appellees are not members of the media. First, Phillips is a lawyer who had never written a book before. CR.3519, 3529; CR.Supp2d.298, 316. Phillips, through the assumed name Spindle Top Publishing, self-published *Monster in River Oaks*. CR.3496-3503, 3512-13, 3516-18, 3521. The publisher noted on the book, "Spindle Top Publishing" was not a real company, but only an assumed name. CR.3514. Phillips and his law firm handled setting up a website to promote the book and other forms of advertising. CR.3522-25. Phillips' secretary did word processing and proofreading of the book, CR.Supp2d.16, and was heavily involved in setting up accounts to distribute the

33

book, take orders and ship the books. CR.3541-52. The books were stored at Phillips' law firm and shipped by his secretary from the law firm using its postage meter. CR.3542-48. Nor did the law firm's insurance policy cover possible libel or slander claims arising out of *Monster in River Oaks*. CR.3526.

Appellees cite an unrelated statute in their effort to reclassify themselves as media defendants. Section 22.023 of the Texas Civil Practice & Remedies Code protects journalists from having to reveal certain confidential sources. This statute actually applies a similar test as the primary business test that this Court adopted in *S.E.I.U.* To be a journalist, gathering news must be a substantial portion of the person's livelihood or for substantial financial gain, Section 22.021(2), and the news must be reported in a "news medium," defined in Section 22.021(3). Appellees never offered any evidence that they derived any income from news reporting. In any event, this journalist-shield law does not have anything to do with the burden of proving falsity in a libel action.

Appellees also cite §27.001(7) of the Texas Civil Practice and Remedies Code, enacted in 2011, for a definition of "matter of public concern." But the statute defines "matter of public concern" in the context of a motion to dismiss procedure the Legislature enacted. There is no indication that this term was intended to have anything to do with the burden of proof in a libel case, either to reflect existing precedent or to change the burden in future cases.

Recent cases applying libel principles to internet publishing distinguish between the author of defamatory content and an entity that merely prints the author's content. In *Bierman v. Weier*, 826 N.W.2d 436 (Iowa 2013), the court addressed whether the author and online publisher of a self-published online book were media defendants. The court held that the online publisher was a media defendant, but that the author was not. *Id.* at 460-62. *Bierman* followed a federal court case holding that a defendant who self-published her book using her own personal computer was not a media defendant. *Lassiter v. Lassiter*, 456 F.Supp.2d 876, 878-80 (E.D. Ky. 2006), *aff'd*, 280 F. App'x 503 (6th Cir. 2008). *Bierman* concluded that "a key similarity between both cases is that the underlying author of the allegedly defamatory material remains subject to a potential libel per se cause of action." 826 N.W.2d at 462.

This lawsuit is not against the company that mechanically printed and bound *Monster in River Oaks*. It is against Phillips, who never wrote a book before, has not written any books since, and self-published the book. Appellees are not members of the media.

### 2. The Family's Lawsuit Against Shah Was Not The Subject Of Public Discussion Nor Impacted Third Parties in 2008.

Appellees claim that issues of child safety and child endangerment make *Monster in River* Oaks a publication about matters of public concern. But merely because something may be of interest to the public does not mean it is a matter of

public concern for purposes of defamation law. *Einhorn v. LaChance,* 823 S.W.2d 405, 411 (Tex. App.—Houston [1st Dist.] 1992, writ dism'd w.o.j.). The issue must be "public" both in the sense that people are discussing it and because people other than the immediate participants in the controversy are likely to feel the impact of its resolution. *WFAA-TV, Inc. v. McLemore,* 978 S.W.2d 568, 572 (Tex. 1998). To determine whether a statement concerns a public issue, the court must examine whether people were debating a specific issue and whether the media was covering the debate, reporting what people were saying, and uncovering facts and theories to help the public form an opinion. *Id.*

But Appellees fail to address these (and the other relevant authorities) cited by the family. Instead, Appellees rely on cases that did not involve libel claims. They rely on *Crumrine v. Harte-Hanks Television, Inc.*, 37 S.W.3d 124, 127 (Tex. App.—San Antonio 2001, pet. denied), which was an invasion-of-privacy case. *Wavell v. Caller-Times Publ'g Co.*, 809 S.W.2d 633, 634 (Tex. App.—Corpus Christi 1991, writ denied), was a claim for false light invasion of privacy. The Supreme Court, however later specifically disapproved of *Wavell* in *Cain v. Hearst Corp.*, 878 S.W.2d 577, 578 (Tex. 1994). Neither opinion, and in fact none of Appellees' authorities, say anything about the burden of proving falsity in libel cases.

Appellees did not present any evidence that either the lawsuit against Shah or the 2008 trial attracted any public attention or was a matter of public discussion and debate. Because Appellees are attempting to shift the burden of proof to the family on its defamation claim, it is Appellees' burden to establish that the lawsuit or trial was a matter of public concern. Moreover, as the Texas Supreme Court stated in *Neely*, the placement of the burden of proof on truth or falsity is less important at the summary-judgment stage, because a defendant seeking traditional summary judgment must prove that the defamatory statements were true. 418 S.W.3d at 62, 66 n.20.

In fact, Appellees' emails show that the lawsuit against Shah and the 2008 trial were not the subject of any publicity or public discussion and debate. Phillips' agent attempted to get *Texas Monthly* magazine to write a story about or review *Monster in River Oaks*. CR.3586-95. Her email specifically noted that the book said that it told a story "that has never been told before and could make a great *Texas Monthly* story." CR.3588; *see also* Appellants' Br. at 35-36.

**B.    There Is No Separate "Constitutional" Fair-Report Privilege.**

Appellees also argue that there is a separate "constitutional" fair-report privilege, but their authorities do not establish any such separate privilege. *Langston v. Eagle Printing Co.*, 797 S.W.2d 66 (Tex. App.—Waco 1990, no writ) was decided based on the statutory privilege. *Id*. at 69. The court then added an

argument based on the First Amendment, citing *Cox Broadcasting Corp. v. Cohn*, 420 U.S. 469 (1975). But *Cohn* was an invasion-of-privacy action, not a libel case. *Granada Biosciences, Inc. v. Forbes, Inc.*, 49 S.W.3d 610 (Tex. App.—Houston [14th Dist.] 2001), *rev'd*, 124 S.W.3d 167 (Tex. 2003) has a general discussion of constitutional issues, but these had nothing to do with the court's holding, or the Supreme Court's reasons for reversal. Neither case adopted a constitutional fair-report privilege and no case has cited them as recognizing such a privilege.

## CONCLUSION

Sexual and financial predators are hard to bring to justice. Their victims must overcome powerful emotions to come forward, report and support the prosecution of their victimizers. What this appeal is about is whether other victims of other predators will dare to come forward if they know that they will be defamed for bringing the predator to justice. Will a victim who has read *Monster in River Oaks* want the same thing to happen to her? Will the victim's friends and family encourage the victim to report and help prosecute the criminal, or will they read *Monster in River Oaks* and conclude that reporting the crime will only make things worse? Will predators and their attorneys read Appellees' extortion demand and *Monster in River Oaks* and find a blueprint for avoiding exposure and prosecution?

Respectfully submitted,

/s/Marc S. Tabolsky
Marc S. Tabolsky
State Bar No. 24037576
mtabolsky@yettercoleman.com
YETTER COLEMAN LLP
Two Houston Center
909 Fannin, Suite 3600
Houston, Texas 77010
(713) 632-8000
(713) 632-8002 [facsimile]


Patrick Zummo
State Bar No. 22293450
pzummo@zoomlaw.com
LAW OFFICES OF
    PATRICK ZUMMO
Two Houston Center
909 Fannin, Suite 3500
Houston, Texas 77010
(713) 651-0590
(713) 651-0597 [facsimile]

ATTORNEYS FOR APPELLANTS
JOAN JOHNSON, KALETA JOHNSON,
SETH JOHNSON AND WIRT BLAFFER

39

## CERTIFICATE OF COMPLIANCE

I certify that this brief complies with the type-volume limitation of Texas Rule of Appellate Procedure 9.4(i)(2) because it contains 7,437 words, excluding the parts of the briefs exempted by Texas Rule of Appellate Procedure 9.4(i)(1).

/s/Marc S. Tabolsky
Marc S. Tabolsky

## CERTIFICATE OF SERVICE

I certify that on November 9, 2015, I used the Court's electronic case filing system to file this Reply Brief. I served this document via e-mail on the following counsel for each party:

William W. Ogden
Judith A. Meyer
OGDEN, GIBSON, BROOCKS, LONGORIA &
  HALL, L.L.P.
bogden@ogblh.com
jmeyer@ogblh.com
1900 Pennzoil South Tower
711 Louisiana
Houston, Texas 77002

*Attorney for Appellees*
*Michael Phillips, Spindle Top*
*Publishing, and Phillips Akers*
*Womac, P.C.*

/s/Marc S. Tabolsky
Marc S. Tabolsky